CLERKS OFFICE
US DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED
10/30/2026
LAURA A. AUSTIN, CLERK
BY: s/J. Lopez
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Harrisonburg Division**

MARSHALL LEWIS,

Plaintiff,

v.

ROCKET MORTGAGE, LLC,

Defendant.

Civil Action No. 5:26cv187

## CLASS ACTION COMPLAINT

Plaintiff Marshall Lewis, by counsel, files this Complaint against Rocket Mortgage, LLC. In support of his claims, Mr. Lewis alleges as follows:

## PRELIMINARY STATEMENT

1. As the entities that perform the day-to-day management of loans on behalf of lenders and investors, "servicers can have a direct and profound impact on borrowers."[1]

2. This case exemplifies the devastating impact that inadequate servicing practices can have on homeowners like Mr. Lewis.

3. After suffering financial difficulties, Mr. Lewis sought a loan modification of his mortgage from his loan servicer at the time, Mr. Cooper.

[1] *See* Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696, 10699 (Feb. 14, 2013) (codified at 12 C.F.R. pt 1024) ("2013 Regulation X Amendments").

4. Mr. Cooper approved Mr. Lewis for a trial period plan in November 2025 and promised to permanently modify Mr. Lewis's loan if he successfully completed the trial period plan.

5. During the trial period plan, Rocket Mortgage started servicing Mr. Lewis's loan, and even though Mr. Lewis submitted all trial payments as required, Rocket Mortgage refused to offer Mr. Lewis a permanent modification.

6. To understand why Rocket Mortgage would not honor Mr. Cooper's promise to modify his loan, Mr. Lewis sent Rocket Mortgage a Qualified Written Request ("QWR") disputing its loan servicing, asking it to permanently modify his loan and stop the negative credit reporting after he completed the trial period plan. Mr. Lewis's QWR also asked Rocket Mortgage to send him certain documents about his loan.

7. Rocket Mortgage failed to properly respond to Mr. Lewis's QWR.

8. Rocket Mortgage also continued to provide derogatory information regarding overdue payments during the 60-day period after it received Mr. Lewis's QWR.

9. Upon information and belief, Rocket Mortgage's failure to cease its negative reporting following receipt of Mr. Lewis's QWR was the result of standardized processes and procedures.

10. As a result, Mr. Lewis alleges a class claim against Rocket Mortgage under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e)(3), for continuing to provide derogatory information about the allegedly overdue payments during the 60-day period after Rocket Mortgage received Mr. Lewis's and the putative class members' QWRs.

11. Mr. Lewis also alleges an individual claim against Rocket Mortgage under RESPA, 12 U.S.C. § 2605(e)(2), for failing to properly respond to his QWR.

## JURISDICTION AND VENUE

12. This Court has jurisdiction under 28 U.S.C. § 1331 and 12 U.S.C. § 2605(f).

13. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the acts and transactions that support this Complaint occurred here.

## PARTIES

14. Plaintiff Marshall Lewis is a natural person who resides in Waynesboro, Virginia.

15. Rocket Mortgage is a Michigan limited liability company with its principal office in Detroit, Michigan. At all times relevant to this Complaint, Rocket Mortgage was a mortgage loan servicing company governed by RESPA.

## FACTS

16. Mr. Lewis, a U.S. Marine Corp veteran, purchased his home in Waynesboro, Virginia in 2006, which he refinanced in January 2013.

17. Mr. Lewis's refinanced loan was a federally-related Veteran's Administration loan.

18. Mr. Lewis's loan was eventually transferred to Mr. Cooper for servicing.

19. In 2024, Mr. Lewis's business experienced an unexpected slowdown, which reduced his income and made it difficult to make his mortgage payments. Eventually, Mr. Lewis applied for a forbearance and then a loan modification so that he could keep making payments and stay in his home.

20. In November 2025, Mr. Cooper approved Mr. Lewis for a loan modification and told him that his first modified payment was due on January 1, 2026. Mr. Cooper told him that he would obtain a permanent modification if he successfully completed the trial period plan, which required him to make three trial payments.

21. Mr. Lewis complied with the trial period plan and made his three trial payments as required.

22. In January 2026, Mr. Lewis's loan was transferred to Rocket Mortgage for servicing following Rocket Mortgage's acquisition of Mr. Cooper.

23. Even though Mr. Lewis complied with all of the trial period plan requirements and made his trial payments as required, Rocket Mortgage sent him a letter in March 2026 that stated that Mr. Lewis's permanent modification was rejected due to his failure to make his modified payments.

24. Rocket Mortgage's denial of Mr. Lewis's permanent modification was an error because, again, Mr. Lewis made all of his trial period payments.

25. In May 2026, Mr. Lewis sent a Qualified Written Request to Rocket Mortgage to figure out why it had denied him a permanent modification.

26. This letter contained all of the necessary information to be considered a Qualified Written Request, including Mr. Lewis's personal information and the loan information, and was sent to the address that Rocket Mortgage has designated for Qualified Written Requests.

27. Mr. Lewis's Qualified Written Request alerted Rocket Mortgage to its error of denying him a permanent modification. He explained that he had made all of his trial payments on time and provided proof of those payments. He asked that Rocket Mortgage correct its accounting to reflect the trial payments as received and applied, rescind the denial of the permanent modification, and cease all occupancy inspections and phone calls seeking payment on the account.

28. Rocket Mortgage responded to Mr. Lewis's Qualified Written Request on July 24, 2026.

29. Rocket Mortgage acknowledged that there was a servicing error on Mr. Lewis's account caused by a coding error. Due to that error, Rocket Mortgage told Mr. Lewis that he would be approved for a permanent modification and that the deadline for him to sign and return the modification agreement would be extended through August 31, 2026.

30. Rocket Mortgage, however, did not stop reporting negative information about Mr. Lewis's loan in the 60-day period following Mr. Lewis's QWR, even though he disputed how his payments had been applied to the account.

31. Following Rocket Mortgage's QWR response, Rocket Mortgage sent Mr. Lewis a permanent modification agreement.

32. However, this agreement still contained errors, as the principal balance was $5,000 more than the original permanent modification amount, and a monthly payment amount that was $250 more than the original modification, which made it unaffordable for Mr. Lewis.

33. Because the permanent modification still contained errors, Mr. Lewis sent a follow-up Qualified Written Request to Rocket Mortgage in August 2026.

34. This letter contained all of the necessary information to be considered a Qualified Written Request, including Mr. Lewis's personal information and the loan information, and was sent to the address that Rocket Mortgage has designated for Qualified Written Requests.

35. Mr. Lewis's follow-up Qualified Written Request disputed Rocket Mortgage's erroneous permanent modification terms and the inaccurate payment information that it was reporting to the consumer reporting agencies about his loan. He asked that Rocket Mortgage send him a correct modification agreement, remove negative credit reporting about his loan, and remove any fees or charges assessed to his loan after March 2026, when the loan should have been permanently modified.

36. Mr. Lewis also requested that Rocket Mortgage send him the servicing notes for his loan, confirmation of his current lender and when it became the lender, and copies of any invoices supporting any fees or charges assessed to his loan.

37. As of the date of this filing, Rocket Mortgage has not responded to Mr. Lewis's second QWR.

38. However, Rocket Mortgage has continued to report derogatory information about Mr. Lewis's mortgage in the 60-day period following receipt of his QWR, including through its monthly reporting as well as confirming the derogatory information to the consumer reporting agencies in response to Mr. Lewis's dispute letters.

39. Mr. Lewis has suffered damages because of Rocket Mortgage's conduct.

40. For example, when Rocket Mortgage refused to correct Mr. Lewis's account in response to his QWRs, he suffered damages, including informational injury, ongoing credit injury, and emotional distress, including fear, distress, and anxiety that he was never going to be able to get his mortgage corrected and would ultimately end up in foreclosure because of Rocket Mortgage's failure to correct his account.

**COUNT ONE:**
**Violation of RESPA, 12 U.S.C. § 2605(e)(3)**
**(Class Claim)**

41. Mr. Lewis incorporates the preceding paragraphs.

42. Under Federal Rule of Civil Procedure 23, Plaintiff seeks certification of the following class (the "RESPA Reporting Class"):

> All consumers: (1) who is subject to a mortgage serviced by Defendant; (2) who sent a Qualified Written Request to Defendant relating to a dispute regarding the consumer's payments; (3) for whom Defendant provided information regarding the overdue payment identified in the Qualified Written Request to any consumer reporting agency during the 60-day period beginning on the date Defendant received the Qualified Written Request.

43. **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Mr. Lewis alleges that the class members are so numerous that joinder of all is impractical. Defendant is one of the nation's largest mortgage servicers. Upon information and belief, thousands of consumers were the subject of Defendant's policy not to suppress credit reporting in response to Qualified Written Request during the class period. These class members' names and addresses are identifiable through Defendant's internal business records, and they may be notified of this litigation by published or mailed notice.

44. **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Common questions of law and fact exist as to all putative class members, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendant ceased providing negative payment information during the 60-days following receipt of a Qualified Written Request; (2) whether Defendant's conduct violated RESPA; and (3) the proper amount of damages.

45. **<u>Typicality</u>. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member. In addition, Plaintiff is entitled to relief under the same causes of action as the other putative class members. All claims are based on the same facts and legal theories.

46. **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4)**. Plaintiff is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the class members that he seeks to represent. Plaintiff has retained counsel competent and experienced in class-action litigation, and he intends to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the putative class

members' interests. Neither Plaintiff nor his counsel have any interests that might cause them to not vigorously pursue this action.

47. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for class members to effectively redress the wrongs done to them in individual litigation. Even if the putative class members could afford individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendant's conduct. By contrast, the class-action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

48. Defendant violated 12 U.S.C. § 2605(e)(3) by continuing to provide derogatory information regarding the overdue payments within 60 days after Defendant received Plaintiff's and the putative class members' Qualified Written Request.

49. Because of Defendant's conduct, Plaintiff and the putative class members suffered concrete and particularized harm, including the reduction of their credit score and emotional distress.

50. Upon information and belief, discovery will demonstrate that Defendant's noncompliance with 12 U.S.C. § 2605(e)(3) is a part of a pattern or practice of noncompliance

with 12 U.S.C. § 2605(e), including because this conduct was a result of Defendant's standard procedures that was used in responding to all Qualified Written Requests.

51. Upon information and belief, Defendant does not have a procedure in place to freeze negative payment information when it receives a Qualified Written Request challenging the validity of the payment information.

52. Plaintiff and the putative class members are entitled to recover actual damages, statutory damages, costs, and attorney's fees from Defendant for their violations of 12 U.S.C. § 2605(e)(3) under 12 U.S.C. § 2605(f).

**COUNT TWO:**
**Violation of RESPA, 12 U.S.C. § 2605(e)(2) and Regulation Z, 12 C.F.R §§ 1024.35, 1024.36**
**(Individual Claim)**

53. Mr. Lewis incorporates the preceding allegations.

54. As alleged above, Mr. Lewis submitted two qualified written requests to Rocket Mortgage, and Rocket Mortgage received the requests.

55. Rocket Mortgage violated 12 U.S.C. § 2605(e)(2) and 12 C.F.R § 1024.35 by failing to make appropriate corrections to Mr. Lewis's account. For example, even though it acknowledged a servicing error and stated that the account would be corrected, it failed to offer Mr. Lewis the correct permanent modification terms that it previously agreed to.

56. Rocket Mortgage also violated 12 U.S.C. § 2605(e)(2) and 12 C.F.R § 1024.36 by failing to provide Mr. Lewis with any of the information he requested or to explain why the requested information was unavailable.

57. Because of Rocket Mortgage's conduct, Mr. Lewis suffered concrete and particularized harm, including: informational injury, ongoing credit injury, and additional emotional distress, including fear, distress, and anxiety that he was never going to be able to get

his mortgage corrected and would ultimately end up in foreclosure because of Rocket Mortgage's failure to correct his account.

58. Upon information and belief, discovery will reveal that Rocket Mortgage's noncompliance with 12 U.S.C. § 2605(e)(2) is a part of a pattern or practice of noncompliance with 12 U.S.C. § 2605(e).

59. For example, Mr. Lewis believes that discovery will reveal that Rocket Mortgage had a uniform practice of refusing to provide documentation that consumers requested in qualified written requests.

60. In addition, the Consumer Financial Protection Bureau's consumer complaint portal shows that 8,218 mortgage-related complaints have been filed against Rocket Mortgage as of October 26, 2026, including 204 complaints for failing to investigate an existing problem. Although the details of these complaints are redacted, Mr. Lewis believes that discovery will reveal this and other evidence to demonstrate a pattern of noncompliance with RESPA.

61. Mr. Lewis is entitled to recover actual damages, statutory damages, costs, and attorney's fees from Rocket Mortgage for each of its violations of 12 U.S.C.§ 2605(e)(2) under 12 U.S.C. § 2605(f).

WHEREFORE, Mr. Lewis, on behalf of himself and the putative class members, moves for class certification and for statutory, actual, and punitive damages, as well as his attorneys' fees and costs against Defendant for the class claims, as well as actual, statutory, and punitive damages and attorneys' fees and costs for his individual claims; for pre-judgment and post-judgment interest at the legal rate, and such other relief the Court does deem just, equitable, and proper.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,
**MARSHALL LEWIS**

By: */s/ Kristi C. Kelly*

Kristi C. Kelly, VSB No. 72791
Andrew J. Guzzo, VSB No. 82170
Casey S. Nash, VSB No. 84261
Matthew G. Rosendahl, VSB No. 93738
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: matt@kellyguzzo.com
*Counsel for Plaintiff*